UNITED STATES RUBBER CO. et al. v. AMERICAN OAK LEATHER CO. et al.

AMERICAN OAK LEATHER CO. et al. v. UNITED STATES RUBBER CO. et al.

(Circuit Court of Appeals, Seventh Circuit. October 3, 1899.)

Nos. 598, 599.

1. INSOLVENT CORPORATIONS—SECRET PREFERENCE OF CREDITORS.

The keeping secret of an arrangement between an insolvent corporation and creditors by which the latter were put in control of the corporation, and were given judgment notes to secure them a preference, for the purpose of enabling the corporation to continue in business, with the knowledge that such continuance necessarily involved the obtaining of new credits by the corporation, which could not be obtained if the facts were known, constitutes a fraud on those who were thus induced to become creditors, although there was no specific intention to defraud them, and the parties may have believed it possible for the corporation to eventually pay in full.

2. SAME—EFFECT OF FRAUDULENT PREFERENCE.

A commercial corporation, being in financial difficulty and largely indebted, made an arrangement with its two largest creditors by which it borrowed from them $50,000, and gave them judgment notes covering such sum and its prior indebtedness to them. As a part of the same arrangement, its board of directors was reorganized by placing thereon a majority of persons nominated by such creditors and having no interest in its business, and its by-laws were amended so as to require action of the directors to authorize the giving of further judgment notes. It was agreed that the new directors should not interfere with the business of the corporation, the sole purpose of their appointment being to prevent preferences to other creditors, and the entire arrangement was kept secret

to enable the corporation to continue its business. The business was continued for six months, when the corporation suspended, having been in fact insolvent when the arrangement was made. During this time some of the indebtedness was paid off, and new indebtedness to the same and other creditors contracted. *Held* that, although the laws of the state permitted the preference of creditors by an insolvent, such transaction constituted a fraud in fact on the general creditors, which not only rendered the preferences given by the judgment notes invalid, but precluded the creditors so preferred from sharing with the other creditors in the distribution of the assets of the corporation.

3. SAME.

A bank, being an unsecured creditor of an insolvent corporation, which was still a going concern, but was known to be about to suspend business, advanced a further sum to the corporation, with knowledge that it was to be used to pay claims in favor of the managing officers of the corporation, and, in consideration of such advance, received judgment notes of the corporation covering its entire claim; and the bills and accounts receivable of the corporation were also assigned to another preferred creditor, who, as a part of the same arrangement, entered into an agreement with the bank to divide pro rata all the proceeds of their respective demands. *Held,* that the fraudulent preference of the managing officers of the corporation rendered the entire transaction fraudulent and invalid as against the other creditors.

4. SAME.

Where certain creditors of an insolvent corporation secured preferences by an arrangement which was fraudulent as to other creditors, and for that reason deprived them of the right to share with such other creditors in the assets of the corporation, a third preferred creditor who became a party to the fraudulent transaction by making an agreement to share with them pro rata the proceeds of all collections made by either on their claims is equally debarred by the fraud, and his claim will be postponed to those of the general creditors.

Brown, Circuit Justice, dissenting.

Appeals from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

We have here an appeal and cross appeal. They are from a final decree rendered in conformity with the master's report of his conclusions on the evidence, and in accord with the theory of the interlocutory order affirmed by this court in United States Rubber Co v. American Oak Leather Co., 53 U. S. App. 444, 27 C. C. A. 118, 82 Fed. 248. The defendants, the rubber companies and the Metropolitan National Bank, dispute that theory, and insist that the preferences which they obtained were valid. The original complainants, and other creditors who intervened, have brought the cross appeal, and insist that the fund in court should be applied to the discharge of their demands, and that in so far as the decree permits the defendants to share in the fund it is erroneous. The character of the case, as now presented, is not deemed to be essentially different from what it was before, but a fuller statement of the facts is desirable.

The corporation, C. H. Fargo & Co., successor to a partnership of the same name, was organized in 1889 to do a mercantile business in Chicago. In 1893 it became embarrassed, and being largely indebted to the rubber companies (the United States Rubber Company of New Jersey and L. Candee & Co. of Connecticut) and to the Metropolitan National Bank of Chicago, and being compelled to yield to the demand of the latter for security, executed judgment notes to the bank for $130,000, and to the rubber companies for sums aggregating $200,000; those companies not asking but accepting security because the bank exacted it. The Fargo Company had an agreed line of credit with the bank to the amount of $50,000, which was sometimes exceeded. The judgment notes given in 1893 were paid in part, from time to time, and before the close of 1895 were surrendered, and ordinary promissory notes taken for the unpaid balances. On December 30 or 31, 1895, the corporation, being

again unable to meet its maturing obligations, sent telegraphic messages to the rubber companies, in response to which Charles L. Johnson and Huston M. Sadler, Jr., as representatives of those companies, which some months before had become one in interest, went to Chicago, arriving January. 2, 1896, and on the evening of that day commenced with Charles E. Fargo negotiations which on the 6th terminated in the agreement, the character of which is now the subject of dispute. In those negotiations Johnson and Sadler were assisted and advised by the local counsel of the rubber companies, Mr. William A. Beale, who was present at most of the interviews. At that time there was due from the Fargo Company to L. Candee & Co., as evidenced by notes given in settlement the preceding November, $44,900; to the United States Rubber Company on open account for the proceeds of sales of consigned goods, $141,537.13; to the Metropolitan Bank, $50,000; and to others, $210,216.20,—a total of $446,653.33. The value of the assets at that time was not definitely ascertained, but was represented by the Fargos to exceed largely the liabilities. In fact it was much less. Johnson, on arrival, was told of the company's embarrassment, and was asked to have his companies make a loan of $25,000 to meet paper soon to mature. He refused the request, and solicited security for what was owing to his companies; urging that, on account of what they had done in 1893, they were entitled to preference over other creditors. That meant, and was understood to mean, an immediate suspension of business, and was refused by Charles Fargo, who insisted that a failure was not necessary, and that, if they had to go to the wall, they would treat all creditors alike. The negotiations then proceeded, but without result until January 6th; the whole effort for four days, so far as disclosed, being expended in the endeavor to devise a plan whereby the rubber companies could be made absolutely secure, and the Fargo Company be able to continue in business. The idea of putting the board of directors under control of the rubber companies having been suggested, and it having been determined that the loan had better be $50,000, Johnson, acting for L. Candee & Co., then proposed to lend the Fargo Company $50,000 for six months, upon the understanding that the loan and the previous indebtedness for $44,900, and the debt due and to become due to the United States Rubber Company, "should be secured in such way as might be satisfactory to their counsel, Mr. Beale." This proposition was accepted on the same day, and, as the master's report proceeds to say, "it was agreed and arranged between the parties as follows: First. That the $50,000 should be advanced to the Fargo Company by L. Candee & Co. partly on that date and during the succeeding two weeks. Second. That the Fargo Company should that day execute and deliver its three judgment notes,— one for $45,000, payable on demand to the order of L. Candee & Co., to secure that company with respect to its liability as indorser or guarantor upon the notes for $44,900 given previous to January, 1896; one for $51,500, payable on demand to L. Candee & Co., as collateral security to plain notes of the Fargo Company which were given as evidence of the advance of $50,000 then to be made; and one for $140,000, payable on demand to the order of the United States Rubber Company, as collateral security to the then existing and to any future indebtedness of the Fargo Company to the United States Rubber Company as aforesaid. Third. That, in case the Fargo Company should at any time find it necessary to suspend business, it would assign as additional security all its accounts and bills receivable, that it should not give any judgment notes to other creditors which would impair the security to the rubber companies, and that the $50,000 advance should be used by the Fargo Company in reduction of its general indebtedness as it matured. And, fourth, that the four employés of the Fargo Company who were on the board of directors, and also E. A. Fargo, should retire from the board, and there should be elected in their places by the stockholders of the company five persons, to be nominated by said Beale, in whom he had confidence, one of whom should become secretary and treasurer, and that the directors so to be elected at Beale's nomination should not hamper or interfere with the proper carrying on of the ordinary business of the company."

On the same day a meeting of the board of directors of the Fargo Company as then and theretofore constituted was held, at which was passed a resolution authorizing the borrowing of the $50,000, and the giving of judgment

notes therefor and for existing indebtedness, as stipulated; and accordingly three judgment notes ·"were executed and delivered by Charles E. Fargo, president of the company, Frank M. Fargo, vice president and treasurer, and E. A. Fargo, secretary, and the loan of $50,000 was perfected; $10,000 being advanced at the time, and the balance of the $50,000 during the succeeding two weeks." This action was ratified on the 8th day of January, 1896, by the unanimous vote of the stockholders of the company, all the shares being repre-·sented. The three Fargos had been for some time the owners of all the shares. An effort was made to reduce to writing the understanding, but Charles Fargo insisted upon terms to which Mr. Beale would not assent; and Mr. Johnson, who was on his way eastward, being informed of the situation, sent from Altoona, Pa., on January 7th, a telegram to Mr. Beale containing the following: "Sadler has explained the situation to me. Think position should be made absolute as soon as possible, by completing arrangement as arranged, and organization of directors ·to prevent giving other judgment notes. * * * Failure thus to protect us should result in executions by us. Use, at your discretion, all judgment notes in your possession, in order ·to put our claim beyond peradventure." This having been read to Mr. Fargo, he consented to trust Johnson in the matter without a written agreement.

At a meeting of the stockholders on January 9, 1896, George C. Madison, Tiffany Blake, Buell McKeever, Frederick B. Fuller, Gilbert E. Porter, Charles E. Fargo, and Frank M. Fargo were elected directors for the ensuing year; all except the Fargos and Blake being employés in the office of Beale, and Blake being assistant corporation counsel of the city of Chicago, of which Beale was then corporation counsel, and all except the Fargos were chosen at the suggestion of Beale. At a meeting on the same day of the newly-elected board, Charles E. Fargo was re-elected president of· the company, Frank M. Fargo, vice president, Buell McKeever was made secretary and treasurer, and the by-laws of the company were so amended as to forbid the giving of judgment notes or preferential security without special authorization from the board of directors. The change of the board of directors and officers, the· change in the by-laws, and the resolution authorizing the execution of judgment notes and an assignment of accounts, the master reported, "were all for the purpose of giving preferential security to the rubber companies, and the matter was kept secret in order to allow the Fargo Company an opportunity of getting through embarrassments apparently temporary, but not with a fraudulent intent as to the other creditors of the company." The report then proceeds: "The only purpose and object of changing the board of directors as aforesaid, and of amending the by-laws, was to protect the rubber companies against the giving by the Fargo Company of preferential security or judgment notes to other creditors, which should be superior [or equal?] to the security of the rubber companies. * * * The arrangement as made was carried out in good faith by the parties, and the directors elected at the suggestion of said Beale took no part in the active management of the Fargo Company after their election, and no stockholders' and directors' meetings of the Fargo Company were held after January 9, 1896, until August 5, 1896."

It further appears that between January 6 and August 6, 1896, new liabilities were incurred by the Fargo Company to creditors other than the rubber companies and the bank to the amount of $246,660.54, of which there was due and unpaid on August 6, 1896, $142,690.95, and during the same period the Fargo Company paid to general creditors in the regular course of business more than $300,000; paying all of the indebtedness of January 6, 1896, which was largely to persons who are now creditors. Charles and Frank Fargo were personally liable upon portions of the debts of the company in January, and those portions were paid off before August. The original debt of $44,900 to the Candee Company was paid, and $13,470 on the loan of $50,000. To the United States Rubber Company as much as $15,000 was paid on old indebtedness, but additional consigned goods were sold to the amount of $24,-534.04, of which the sum of $5,534.04 only was remitted, so that the sum due that company on August 6 was $142,424.81, and there was due to L. Candee & Co. $36,530. All credit given to the Fargo Company after January 9th, except by the rubber companies and $10,000 by the bank, was given in ignorance of the execution of the judgment notes to the rubber companies, of the

change of directors and officers, and of the arrangement existing between the rubber companies and the Fargo Company. Of the liabilities so contracted, the amount still unpaid exceeds $110,000. Besides the mere ignorance of the facts reported by the master, the evidence shows that in order to obtain credit of the banks at Dixon it was represented, in response to direct inquiry, that the company had given no judgment notes; and to the representative of another creditor, the Pfister & Vogel Leather Company, seeking payment or security, Charles E. Fargo, while denying that he had made a direct statement that the company had given no judgment notes, admitted that in response to inquiry he had made evasive answers likely to produce, and which he intended to produce, that belief. His testimony on the point presents an interesting picture of one who in all this transaction is credited with having had no wrongful purpose. About the last of July it became evident that a collapse was inevitable, and, with that result in view, Charles Fargo, desiring money for the individual uses of himself and brothers, sought to obtain for the company from the Metropolitan Bank, to which there was then owing $40,000 unsecured, an additional $10,000. His plan was to have the bank admitted into the arrangement with the rubber companies, and for the purpose of obtaining the consent of those companies he went to New York. He obtained the desired consent, but, according to the testimony of Mr. Sadler, without revealing the purpose to cease business. Mr. Sadler returned with him, or after a day or two followed him to Chicago, but for what purpose is not disclosed. Though not admitted, it is difficult to believe that he left Chicago without knowledge of what was being and about to be done.

In respect to the coming of the bank into the arrangement with the rubber companies the master found, among other things, "that C. H. Fargo represented to the president of the bank that C. H. Fargo & Co. was indebted to him and his brothers for money exceeding $10,000, which they had borrowed upon their notes for the benefit of the company, and which they had paid over to the company for use in its business, and that said Fargo brothers had put up some bank stock that they owned as collateral to said notes; and C. E. Fargo thereupon proposed to said bank that if it would loan said C. H. Fargo & Co. $10,000 in addition to its then existing loan, so that said company could reimburse him and his brothers and enable them to take up said notes, he would procure from the said C. H. Fargo & Co. judgment notes for said bank, both for said sum so advanced as aforesaid, and also for the notes then remaining due said bank to the amount of $40,000." Without a further rehearsal of details, it is sufficient to state that the bank was informed of the arrangement with the rubber companies, consented to join in it, advanced the additional $10,000, making its entire demand $50,000, received therefor two judgment notes for $25,000 each, accepted in immediate payment of one of them a conveyance by the Fargo Company of its manufacturing establishment and plant at Dixon, and contemporaneously entered into an agreement with the rubber companies that each would account to the other, and divide all sums realized pro rata according to the amounts of their respective claims. The bank and the rubber companies proceeded at once to take judgments, and to cause executions to be issued and levied. The accounts of the Fargo Company were assigned to the rubber companies as stipulated, and were placed in the hands of Mr. Beale's firm for collection, —an arrangement which was continued by order of the circuit court,—and the amounts realized therefrom and from the disposition of the property by the marshal have been duly reported.

Exceptions were filed to the master's report by the American Oak Leather Company, and by that company jointly with the other complainants, all of which the court overruled. Errors are assigned by the rubber companies jointly, and separately by the Metropolitan National Bank and by the United States Rubber Company. The errors assigned on the cross appeal are directed to the rulings upon exceptions to the master's report as well as to the final decree.

Henry S. Robbins and George A. Follansbee, for appellants in cause No. 598.

Jacob Newman and Frederick A. Smith, for appellees.

Before BROWN, Circuit Justice, and WOODS and JENKINS, Circuit Judges.

WOODS, Circuit Judge, after stating the case, delivered the opinion of the court.

Questions of fraud in law and fraud in fact are in their natures separate, though not always distinguishable by clearly defined lines. In this case they have been presented separately in the briefs and in the argument at the bar of the court, but the facts bearing upon them are so commingled, and to a large extent inseparable, that, to avoid repetition, no attempt will be made as we proceed to keep the distinction all the while in view.

There can be no doubt that the question of the validity of the preferences given to the rubber companies and to the bank should be determined by the law of Illinois, where the attempt to give them was made. That law, it is also certain, authorizes judgment notes, and permits the preferring of creditors by insolvent debtors, whether individual or corporate; and reference has been made to the decisions in Field v. Ridgely, 116 Ill. 424, 6 N. E. 156, Hegeler v. Bank, 129 Ill. 157, 21 N. E. 812, and Haas v. Sternbach, 156 Ill. 44, 41 N. E. 51, for adjudications of the validity of preferences obtained by means of judgment notes which had been withheld from record "for four years," "for more than a year," and "for five years," while the debtor continued in business, obtaining, as it was alleged, new credit which would have been refused if the existence of the judgment notes had been known. In Hegeler v. Bank, mortgage security had been offered by the debtor, but refused by the creditor "because it would injure the credit of the glass company and prevent it from obtaining credit elsewhere." The court in that case said:

"The argument proceeds throughout upon the proposition that the bank took its notes and held them under circumstances that made its conduct operate as a fraud upon others. There is no pretense that there was any agreement to conceal its claim against the glass company; much less, that any such agreement was made for the purpose of enabling the company to obtain credit from others. No evidence can be found in the record proving or tending to prove acts or declarations on the part of the appellee calculated to induce appellant to give credit to the glass company. There is nothing in the bill, and certainly nothing in the evidence, to show that, at the time appellee took the notes and refused to take mortgage security, it did not honestly believe that, notwithstanding the insolvency of the glass company, it would, if its credit could be maintained, successfully recover from its embarrassment, continue business, and pay all its debts."

In Haas v. Sternbach, a mortgage on real estate, kept off the record at the request of the mortgagor with the view to an early sale of the property, was pronounced not fraudulent as against creditors of the firm of which the mortgagor was a member; but an important distinction of that case, as well as of the preceding one, from the present, was marked by the court when it said:

"There was no agreement or promise to keep the mortgage secret, but simply that it would not then be recorded; and there is an entire absence of proof that Charles Sternbach or his firm did or said anything, other than

withholding the mortgage from record, which could have misled others as to its existence."

"Thus, in Illinois it is clearly established law," say counsel, "that the maintenance of secrecy respecting a preference, without 'fraudulent intent as to other creditors,' does not make the preference fraudulent;" and to reinforce the proposition they cite Sanford Fork & Tool Co. v. Howe, Brown & Co., 157 U. S. 312, 15 Sup. Ct. 621; Manufacturing Co. v. Hutchinson, 24 U. S. App. 145, 11 C. C. A. 320, 63 Fed. 496. Whatever may be thought of the legislative policy which permits the execution and long holding of unrecorded judgment notes, the decisions cited afford no precedent, direct or inferential, in justification of the scheme in question, the like of which, we believe, if ever conceived, never before was brought into effective operation. As a judicially sanctioned or commercially accepted possibility in business it is unbelievable. It could be attempted only by a corporate debtor, and its approval by the courts would afford a new and fruitful motive for the creation of corporations by the many who would be quick to avail themselves of so promising a method of pursuing hazardous enterprises at the risk of others. "The maintenance of secrecy," to repeat the words chosen by counsel to express the scope of the decisions referred to, does not signify necessarily more than the fact of secrecy, begun and continued without previous agreement or purpose to maintain it; but secrecy kept for a specific purpose means much more. The master's finding on the point implies, and the evidence demonstrates, a mutual understanding between those concerned that secrecy was necessary, and an express agreement that it should be kept would not have made the understanding more clear, or its fulfillment more imperative. During the negotiations the suggestion of a chattel mortgage was advanced, but promptly rejected, because without the publicity of recording the security would be invalid against other creditors. The scheme adopted, which, if upheld, though not constituting a recognized form of lien, would be a better security than a chattel mortgage, was accepted not only because it would make secrecy possible, but because it would render exposure impossible, if those employed to execute it kept faith; and that every one of them was given to understand, that, once the scheme was on foot, his chief responsibility would be to maintain a discreet silence, the proof is clear, and there has been no attempt or apparent disposition to deny. Returning to the language of the report: "The matter was kept secret in order to allow"—that is to say, for the purpose of allowing—"the Fargo company an opportunity of getting through embarrassments apparently temporary;" and that, of course, and avowedly, they were to do, or to try to do, by continuing the business under a plan which without secrecy was known to be impossible, and by which the risks of the business were shifted wholly upon those who, not suspecting the situation, should give undeserved credit. Secrecy kept for a purpose is not accidental or unintended; it is premeditated; it is, in essence, the same as if agreed upon; and the color imparted by it to this transaction, when all the circumstances are

96 F.—57

considered, is not removed by the added words of the finding, "but not with a fraudulent intent as to the other creditors of the company." Read strictly, that part of the finding is not broad enough to include subsequent creditors, against whom the scheme was so plainly wrongful that Charles Fargo, who is credited with having suggested the making of the change in the directory of the company, after a time became unwilling to pursue it further by seeking renewals of the company's notes in bank. If, however, the master intended, as it seems probable he did intend, to find that the parties to the scheme had no conscious purpose to harm either present or future creditors, the finding cannot abrogate or restrict the application of that familiar rule, without which a coherent code of law or morals would be impossible; that men shall be deemed to intend the natural and probable consequences of their acts or conduct. What did these people intend "as to other creditors"? Plainly, that they should remain or become creditors without security or the possibility of obtaining it, and be at the mercy of themselves, who by a secret control of the corporation were to be able at any hour to close its doors and appropriate all its property to the payment of their own demands. There is a pertinent passage in the testimony of Mr. Beale. After explaining that he had personally cautioned Charles Fargo against being too hopeful, being inclined to branch out, and possibly having too much time to go fishing, and telling him that "he was all right if they handled their business as it ought to be handled," he added:

"They had started with a big business, and ought to be able to carry it along, even through these hard times; but I was particularly desirous that through any strong temptation he should not put the Metropolitan Bank in a position where it could claim to have been deceived. I do not think that the idea. of other creditors,—merchandise creditors,—or their position, entered the mind of either Mr. Johnson or Mr. Sadler or myself during the entire transaction. We were thinking of the Metropolitan Bank, and were anxious to see that that indebtedness should not increase after we made the arrangement, and that subject—reference to the Metropolitan Bank—formed the subject of some conversation between Mr. Johnson and myself; and I distinctly remember, at one of the interviews at the Auditorium Annex, saying that Fargo after that must not go to the Metropolitan Bank to borrow additional money. We had in mind that he would not need to increase the credits after getting this $50,000 from the rubber companies."

One creditor, at least, was important enough to be thought of and talked of, and to be the object of solicitous care that, "through any strong temptation," Fargo should not put it in a position where "it could claim to have been deceived." What stronger condemnation could there be of the scheme, or better proof that its essential character was apprehended (though unconsciously, according to the finding) by those who were about to put it into operation? There were potent reasons for thinking of the bank, and for desiring that it should not have ground for asserting deceit. Mercantile creditors were further away, and individually of much less importance, it is easy to see, than the Metropolitan National Bank, with which it was a part of the plan to keep up, though it seems not to increase, the Fargo company's line of credit; but all that only emphasizes the wrong done in forgetting others equally entitled to consideration, if

they were forgotten; and, if they were purposely left out of consideration, still greater was the wrong.   The apprehended power of temptation proved too strong for one of the Fargos when he obtained credit of the Dixon banks by a direct denial that judgment notes had been executed, and for another of them when by an evasive denial he intentionally produced the same belief.   Mr. Beale, concerned only with the legal aspects of the situation, and pressed with other business, testified as he remembered; but is it possible to believe that neither Johnson nor Sadler, during the four days devoted to this one matter, thought and talked of the bearing of the transaction upon one creditor, the bank, and did not think of its import either to those who should give credit in the future, or to present creditors, whose demands were a large factor in the situation, and could not have been omitted from an intelligent estimate of what had been and must be done?   Their testimony contains no assertion or admission of such forgetfulness.   The inventors of the scheme were bound to apprehend its probable consequences, and in fact nothing occurred after January 9th, when it was put into operation, which was not then reasonably to have been foreseen.   The large existing indebtedness, present embarrassment, and the unsettled conditions of business were known.   The plan then adopted to keep the business going, of course, was known in all its features.   It was known, too, that new credit was to be sought, and that success was uncertain, to say the very least, in a degree far beyond the ordinary contingencies of a new business starting well, or of an old business in an unembarrassed condition.   That the rubber companies apprehended a breakdown is demonstrated, aside from other considerations, by the extraordinary and unheard-of means which they employed to guard themselves against all foreseen contingencies; knowing that by the same means the consequences, however disastrous, would be turned upon others, who, misled by the appearance of a well-sustained and prosperous business, should give credit to the Fargo Company.   Two years before a like embarrassment of the company had been bridged over by an agreement with the rubber companies and the bank, but judgment notes only were then required.   The lapse of time had not improved the situation.   The debt to the bank had been largely reduced, and that to the rubber companies by a small amount, but in the aggregate the liabilities still exceeded $400,000. The assets were represented to be considerably in excess of that amount, but no examination or close inquiry was made into the truth of the representation, though it was of a character which, under the circumstances, ought to have challenged belief.   To a large amount, not then definitely stated, perhaps, but in the report of April 1, 1896, to the Dun Agency put at $366,000, they consisted of notes and book accounts; and yet, for the purpose of devising means to raise $25,000,— a mere bagatelle, as a witness accepting the word from M. Beale called it,—the representatives of the rubber companies were summoned on a day's notice to come from New York to Chicago, and after arrival devoted four days to the achievement.   If the notes and accounts were good, as represented, the aid of the rubber companies was not needed to raise $25,000, or twice that sum; or, if needed,

why were not notes and accounts turned over at once as collateral, either for the $50,000 alone, or for that and the original indebtedness? They could have been put at once into the same process of collection which was employed six months later. That course could have been pursued without impairing the standing of the company. But the evident truth is—and Johnson and Sadler were not much deceived about it—that the statement of assets in that particular, and in others, like the plant at Dixon put down at $110,000, when in fact worth nothing over incumbrances, was greatly exaggerated; and they can hardly be credited with not understanding that the company was then practically insolvent, and, without the indulgence of its creditors, bound to close its doors. Even if the bank and rubber companies had agreed to hold their demands in abeyance, the company would have been unable to meet its liabilities of $210,000 to other creditors. To say the least, and without going beyond the facts reported by the master, the agents of the rubber companies knew that the Fargo Company owed commercial debts to the amount of $400,000; that, while its assets were asserted to be largely in excess of that amount, they were not presently available, and that the company could go on in business for the next month only by procuring a loan of $25,000; and that, to be able to go on certainly for a longer time, $50,000 would be necessary. It was hoped—let us say it was believed—by all concerned that with that sum, under the plan agreed upon, the company "would be able to weather the storm." It was a storm, they knew, and no matter what they believed, without better reason than the word of their debtor discredited by facts within their own knowledge, they had no right, in an attempt to ride out the storm, to adopt a deceitful plan, which they hoped might succeed, but by which, if failure came, loss, supposed to be made impossible to themselves, would certainly befall others. They may well be credited with having believed that the assets were then sufficient and that in the prosecution of the business under the plan proposed they would remain sufficient for the payment in full of their own demands, including the added $50,000; but beyond that, if their scheme were lawful, they did not need to care, and evidently did not, during the negotiations, very much concern themselves.

It was not, as alleged in the bill, a part of the plan that increased purchases should be made for the purpose of improving the security of the rubber companies. On the contrary, the opposite course was recommended by Mr. Johnson, and to some extent was pursued; resulting, as stated, in a reduction of indebtedness about equally in the aggregate to the rubber companies and to other creditors. There was no necessity, at least no known necessity, for a different course in the interest of the rubber companies; their security being supposed to be ample, and it being in their power, by means of immediate judgments and executions, to exclude all other creditors until their demands were satisfied. The notes and accounts, though not leviable by execution, they supposed could not escape them, because they had a contract with the old board of directors for their transfer, which the new board appointed to do their bidding would see performed. This suggestion, it is true,

goes a little beyond the finding of the master that "the only purpose of changing the board" was to protect the rubber companies against the giving of preferential security or judgment notes to other creditors; but it is evident that other emergencies might have arisen that would have called for the active interference of the board, directly or indirectly, for the protection of the rubber companies, and it is idle to say that the board was not constituted as it was for the purpose of meeting whatever emergency might arise in the interest of those companies. "Practically, they sat on a safety valve, * * * so far as protection to the rubber companies was concerned," answered a witness, accepting again the words of counsel; and the full significance of the figure is in the fact that the craft they were sailing, if allowed to blow up, unless the navigators should bungle their work, could not injure owners, nor crew, nor certain passengers, but only those who should have come aboard in the innocent belief that the boat was one of ordinary type, and that they were exposing themselves to no risks from which the captain, crew, and other passengers were exempt. While that craft, it is not overlooked, was "a going concern," yet, by the mere appearance given it of staunchness and completeness of equipment, it was calculated to allure the unsuspecting to a voyage beset with unwonted dangers.

It has been emphasized in the taking of testimony that the Fargos were to be left to conduct the business in their own way; that the new board, or the new trustees, were not to interfere with them; and that McKeever, the new treasurer-elect, was to be treasurer in name only. This, it is explained, was done so that if the former treasurer, who was still to be treasurer in effect, and on the letter heads kept in use was still designated as treasurer, should join in the execution of judgment notes, as in 1893 he had done, his authority could be denied by showing that he was not in fact treasurer. It was a fraud on the law to constitute a board of trustees and a treasurer of a corporation of men who from the beginning were pledged not to give attention to their duties, or to participate in the management of the business of the corporation, further than to protect the rights of particular creditors in whose interest alone they were given their places; and when, in addition to enjoined silence and secrecy on the subject, letters under the old form of letter head, showing the old officers to be still in office, were sent out as they were to old customers and to new, it was an act of deception for which the rubber companies cannot escape liability, since that it should be done was implied in the plan adopted. It was essential to the secrecy which it was understood should be preserved, and was within the stipulation that the Fargos should be allowed to keep the business going and to conduct it without interference. It is no answer to say that those who dealt with the company did not consider nor care who were the officers. A change in the names on the letter heads could not be made, because likely to excite inquiry, and inquiry implied exposure.

When it is important to know the motives of men, their conduct is to be considered, rather than their assertions, especially when

they testify in support of large pecuniary interests, either their own or of others put at hazard by their conduct. In the negotiations of January Charles Fargo at the beginning was master of the situation. He was able to compel and did compel Johnson to accede to his terms, and it was only by reason of an untimely delivery of the judgment notes, due on demand, before getting the written agreement which he desired, that he found himself in Johnson's power, and Johnson determined upon immediate action,—willing, as he had declared himself a day or two before, to lose $25,000 or $50,000 rather than that the Fargo Company should fail. What Johnson wished and sought at the beginning was security for the $186,437.13 owing to his houses, and, when denied that on terms which involved an immediate suspension of the Fargo Company, he began to negotiate on the basis proposed,—of a loan to enable the company to continue in business. Touching his own motives, Charles Fargo testified to a belief that suspension was not necessary, and would not be. He was either purposely ignorant of the situation, or unreasonably hopeful. He had a special motive, however, for seeking to escape immediate surrender, in the fact that he and his brother Frank were indorsers upon the company's paper to other creditors than the bank and rubber companies to the extent of $15,-000, and, if the business could be kept going a few months that paper could be taken up. It was taken up before the collapse in August. The Fargos, therefore, were acting probably under two motives,—one to keep the business going, with whatever hope they had of ultimate success, and the other to keep it going long enough to pay off the obligations of the company on which they were personally liable. The controlling purpose of Johnson was to get security, and in order to get it he yielded to the request of the Fargos for a loan, increasing by that sum the demands of his houses. That price he consented to pay in order to obtain security for the whole indebtedness, believing the security adequate under any contingencies likely to come about during the ensuing six months deemed necessary for the working out of the scheme. He was willing—perhaps, in a degree, hopeful—that the Fargos should succeed, and that other creditors should not suffer; but, except for the interest of the rubber companies and the integrity of their security, he was practically indifferent, and any attempt to put him in any other attitude in the transaction strikes us as unnatural, unbusinesslike, and incredible. In August, as in January, Charles Fargo was able to dictate terms to the others concerned in what was then to be done. This time he had nothing to lose, but something to gain for himself and his brothers, and for the Metropolitan National Bank, of which he was a stockholder. In January, it appears, he opposed the suggestion of admitting the bank into the arrangement with the rubber companies, and it is perhaps not crediting him with too much acumen to suppose that, besides other considerations, he saw the advantage of holding that card for the last play. As an original proposition, it is not probable that the bank would have joined in the scheme, but in the end it was at his mercy, because without yielding the $10,000 it must lose its unsecured $40,-

000, or bring suit, by which at best only a small percentage could be saved. The rubber companies could not oppose him without danger of losing the book accounts and bills receivable which had not yet been assigned, and without exposing their judgment notes to attack by the bank supported by the Fargos, who, perhaps, were the more to be respected because "knowledge is power." But for the "pressure" which Fargo was able to bring upon them, what businesslike reason was there for the rubber companies consenting to share their security with the bank, if they believed it unimpeachable? Whatever they thought in January, they knew then that the property within reach of the executions which they could obtain was insufficient, and with the accounts receivable added would hardly realize enough, to satisfy their own demands. When the agreement was made with the bank, stipulating that each party should account to the other for a prorated share of all sums realized, it is evident that any expectation of full payment had been abandoned. It is recited in the agreement that the parties had "determined to unite their efforts to collect their respective claims,  *  *  *  and share pro rata in the results thereof," but nowhere is there a hint of a possible surplus to divide. The Fargos had carried away their $10,000, the reward for their share in what had been done; and there was no reason, apparent at the time, for inserting in the agreement even a formal expression of the residuary rights of the Fargo company and its victimized creditors. The assignment of the bills and accounts, as finally made, treated as the consummation of the agreement to assign made in January, was tainted with the illegality of that contract, of which it was a part; and if it could be regarded as an independent act, freed of the taint of its origin, it was illegal, because part of a transaction by which the managers of an insolvent corporation going out of business secured a preference for themselves. If the Fargo Company was justly indebted to Charles and Frank Fargo for money which they had borrowed upon a pledge of their bank stock, and the $10,000 obtained of the bank was for the purpose of enabling the corporation to repay them, it was, under the doctrine of Manufacturing Co. v. Hutchinson, supra, an unlawful preference, and made illegal any other preference granted wholly or partly in consideration thereof. This proposition applies also to the preference given to the bank. Besides being managing officers, the Fargos were parties to the original scheme for securing the rubber companies, and, of course, could not prefer themselves over others whom by the false pretenses of that scheme they had induced to give credit to the corporation.

It is contended in behalf of the bank that it entered into the agreement with the rubber companies in ignorance of their arrangement with the Fargo Company, that there was no wrong in its conduct, that nobody was harmed thereby, and therefore that, whatever may be said of the position of those companies, the preference which the bank received is not assailable merely because of its contract to join the rubber companies in efforts to collect their respective demands and to prorate the proceeds. The master has reported that, at the time of the completion of the arrangement, "neither the bank nor

its officers nor attorneys had any knowledge of the change of the directors of the said C. H. Fargo & Co. or of its by-laws." The president of the bank testified concerning his knowledge on the subject. It does not appear that other officers of the bank had anything to do with the matter, and the finding in respect to them is unobjectionable; but, if there is evidence in the record, we have not found it, that the attorney of the bank, who conducted the negotiation, and is shown to have had a much more intimate knowledge of the details of the transaction than the president, did not know every feature of the original scheme. The president of the bank himself testified that when he agreed to loan the $10,000 he knew it was necessary to get the authority of the directors for the execution of the judgment notes for the whole sum of $50,000, and that, on his asking Porter when the judgment notes would be made, "he said it was easy to make them; that the directors were all in that office [Beale's], or could be gotten." That certainly ought to have put him upon inquiry into the reasons for so extraordinary an organization of the directory; and in an earlier part of his testimony, after denying knowledge that the Fargo Company was officered by parties representing the rubber companies, and being asked when he first learned that persons were acting in behalf of the company other than those connected with its management in the sale of goods, he answered: "It might have been the day following. I think it was, from something which was said in Mr. Beale's office by Mr. Porter. My impression is that he said that the directors of the company were men who were employés in the office there, or were part of the firm,—of the law firm there." And again, on cross-examination, he admitted that he did learn "of the extent of the indebtedness to the United States Rubber Company and L. Candee & Co., and also learned that they had some kind of an agreement with the Fargo Company by which they were authorized to secure their indebtedness in advance of any other creditors of the company." All this, it is certain from his own testimony, occurred before the judgment notes to the bank were executed, and before the $10,000 was paid over. If the witness testified to his knowledge or ignorance of the change in the by-laws, we have failed to find the passage; but it is not of much importance, in view of what he did well understand. Besides, if the bank were acquitted of all guilty knowledge and purpose in the transaction, how can it escape the entangling alliance into which it entered with the rubber companies? The agreement between them is still in force, and, if the bank is allowed to retain its preference, it will be bound to pay over to the rubber companies of what it realizes in the proportion of $14 to every $5 received to its own use; and if the preference be set aside, and the bank permitted to share pari passu with other creditors, except the rubber companies, of the amount so received, great or small, it will be bound to account to the rubber companies in the same proportion. The validity of that agreement as between the parties is not in issue, and cannot be affected by the decree in this case. If unlawful and invalid as against other creditors because made in fraud of their rights, it is nevertheless binding as between the parties, and could not be annulled at the suit of either, against the consent of the other,

on account of anything done in this case.    Courts of equity do not interfere to relieve parties from the consequences, though unexpected, of illegal agreements.    Moreover, the bank, if permitted to share in the fund to be distributed, the rubber companies being excluded, would receive more in proportion than if the preferences had been upheld and the division were made between it and the rubber companies.    It is clear that the rubber companies were guilty of fraud in fact, and, as against subsequent creditors of the Fargo Company, should not be allowed to share in the fund for distribution; and, for the reasons stated, the bank likewise should be postponed.

The fact that some of the creditors were creditors when the arrangement between the Fargo Company and the rubber companies was put into operation cannot be allowed to change the result.    It is impossible to say that they were not injuriously affected, even in respect to their prior demands, and it is certain that they would not have given further credit if there had been proper publicity about the things done which were purposely kept secret from them.    The innocent creditors, whether prior or subsequent, are all entitled to share proportionately in the fund.    The rubber companies and the bank are not entitled to share, as against the subsequent defrauded creditors, and therefore cannot be permitted to share with the prior creditors, since thereby they would be sharing with those who were defrauded.    The principal appeal is denied, the cross appeal is sustained, and the decree below is reversed in so far as it permitted the rubber companies and the bank to share pari passu with other creditors, and the cause is remanded, with direction that the decree be so modified as to require the payment in full of all claims of other creditors, if the fund be sufficient, and that, if anything remains, it be paid proportionately to the bank and to the rubber companies.

BROWN, Circuit Justice (dissenting).    On January 6, 1896, the corporation known as C. H. Fargo & Co. was in desperate financial straits.    To avoid an immediate collapse, and to procure the money necessary to continue the business, it entered into an arrangement with its two principal creditors by which the latter undertook to lend $50,000, and the Fargo Company to execute three judgment notes, not only to secure the $50,000 advanced, but $45,000 owing to Candee & Co., and $140,000 to the United States Rubber Company, with a further stipulation to assign its accounts and bills receivable, should it become necessary for it to suspend business.    There was a further stipulation that it should not give any judgment notes to other creditors.    To secure the performance of this, five of the directors of the Fargo Company were to retire from the board, in favor of five persons elected upon the nomination of the preferred creditors.

The general creditors had no knowledge of this arrangement, although the Metropolitan National Bank was subsequently informed of it.

The master found that this arrangement was "for the purpose of giving preferential security to the rubber companies, and that the matter was kept secret in order to allow the Fargo Company an opportunity of getting through embarrassments apparently temporary,

but not with a fraudulent intent as to the other creditors of the company," and that the only purpose and object of changing the board of directors as aforesaid, and of amending the by-laws so as to prevent the giving of judgment notes except by vote of the board, was to protect the rubber companies against the giving of judgment notes to other creditors.

This arrangement continued until August 6, 1896, during which time the Fargo Company continued its business as before, and reduced its general indebtedness and its indebtedness to Candee & Co. to a considerable extent, when it was forced to suspend.

The district judge was of opinion that, although the giving of the judgment notes was not unlawful, the arrangement by which the matter was kept secret while the corporation devested itself of power to give like notes to other creditors, and continued to carry on its business as before, rendered the whole device a constructive fraud upon its creditors.    In this we all agree.

To make it actually fraudulent, such as to require the claims of those preferred creditors to be postponed to the claims of the general creditors, I think it should clearly appear either that the preferred claims were not bona fide, of which there is no pretense, or that the arrangement was entered into, not for the purpose of tiding the company over its immediate crisis, enabling it to continue business, and at the same time to secure the preferred creditors, but for the purpose of ultimately winding it up, and in the meantime of giving it credit, and enabling it to purchase additional goods which the preferred creditors would thereby be able to seize and subject to their own debts.

I find no testimony to satisfy me that an actual fraud upon the general creditors was intended.    The device of changing the directors was evidently not for the purpose of giving up control of the business, but only to secure the arrangement that no other judgment notes should be given, and as a matter of fact the new directors did not interfere with the business of the company as conducted by the Fargos.    Indeed, no meeting of directors was held after the change was made.    No new creditors were induced to give credit to the company upon the faith of their continuing the business, as the evidence shows that with few exceptions the same persons were creditors in January and in August.

Of the alleged misrepresentations of the Fargos to the Dixon Bank and to the Pfister & Vogel Company that no judgment notes had been given, it may be said that they are not admissible as against the claims of the rubber companies, unless there be evidence of a conspiracy between them to defraud their creditors, of which there is no evidence aside from the agreement itself, and that in any event none but the Dixon Bank and the Pfister & Vogel Company could have been injured by these representations.    Such representations might be used as a basis for giving them priority, but they would not inure to the benefit of other general creditors.    Upon the whole, it does not seem to me that such a case of fraud is made out as authorizes the court to postpone the claims of the preferred creditors to those of the general creditors, and thereby practically to

confiscate them, and that there is no sound reason for departing from the general rule laid down by the supreme court in White v. Cotzhausen, 129 U. S. 329, 9 Sup. Ct. 309, and Streeter v. Bank, 147 U. S. 36, 13 Sup. Ct. 236, wherein the preferred creditors were permitted, after their security had been set aside, to stand upon an equality with the general creditors. See, also, Comer v. Tabler, 44 Fed. 467; Brown v. Stove Co. (Tenn. Ch. App.) 42 S. W. 161.

The evidence satisfies me that there was a bona fide attempt to assist the Fargo Company in continuing its business, with the hope of ultimately pulling it through, and that, if this attempt had been successful, it would have redounded greatly to the interest of the general creditors. It was natural, at least, that in making this attempt the rubber companies should have endeavored to secure themselves, not only for their immediate outlay of $50,000, but for their prior debts. In palliation of the secrecy, which was held to make this constructively fraudulent, it may be said that publicity doubtless would have destroyed the entire scheme of raising money to carry on the business.