AMERICAN EXCH. NAT. BANK OF NEW YORK CITY v. WARD et al.

(Circuit Court of Appeals, Eighth Circuit. October 21, 1901.)

No. 1,497.

1. CORPORATIONS—EFFECT OF INSOLVENCY—RIGHT TO PREFER CREDITORS.

The insolvency of a corporation does not ipso facto transform its assets into a trust fund for the equal benefit of its creditors, but such trust attaches only in the administration of the assets after possession is taken by a court of equity; hence so long as a corporation continues in possession of its property it may lawfully prefer one creditor over another.

2. SAME—PREFERENCE OF DIRECTORS.

A corporation is not precluded from preferring a bona fide creditor because he is also one of its directors, although in such case the transaction will be subjected to the most rigid scrutiny by a court of equity, and the creditor must assume the burden of proving his absolute good faith and the justice of his demand. In many cases the condition of

the corporation may be such that it cannot borrow money from outside sources when a timely loan will save it from serious loss, and a director or stockholder who under such circumstances advances money to the corporation in good faith and for its benefit is entitled to all the rights of any other creditor in obtaining security for his demand, either at the time or subsequently.

3. SAME—LEGALITY OF PREFERENCE—FACTS CONSIDERED.

A mercantile corporation had four unsecured creditors, three of whom, holding much the larger part of its indebtedness, as well as all of its preferred stock, by agreement with the common stockholders obtained the election of their representatives as directors and manager; the purpose being to secure a change of management because the business of the company had become unprofitable. The fourth creditor was advised of such action, and made no objection. Such creditors remained in control for 2½ years, during which time they paid the fourth creditor one-third of its claim, but increased the indebtedness of the corporation to themselves by advancing money for its use. It did not appear that any new outside indebtedness was created. At the end of that time, the business having remained unprofitable without the fault of the management, the directors had a chattel mortgage and trust deed executed conveying the property of the corporation to secure its creditors; preference being given to the claims of the controlling creditors. There was no evidence of fraud or bad faith, but, on the contrary, the evidence justified the inference that their action in assuming control was for the purpose of benefiting the corporation and all of its creditors. *Held*, that there was neither actual nor constructive fraud in the transaction which rendered the preference voidable by the fourth creditor, who was not injured, but was in fact the only one of the four benefited, by the transaction.

4. SAME—DEEDS—PRESUMPTION OF VALIDITY.

Where the statutes of a state authorize a corporation to convey property by deed executed by its president or vice president when given such powers by its by-laws, a deed signed by the vice president of a corporation under authority given by the board of directors is presumptively valid.

In Error to the Circuit Court of the United States for the Western District of Missouri.

Prior to March 29, 1895, the Martin-Perrin Mercantile Company, hereinafter called the "Mercantile Company," was doing an extensive business in Kansas City, Mo. It had issued common stock of the face value of $300,-000, and preferred stock of the face value of $150,000. The common stock was held, $150,000 of it by E. L. Martin, its president; $100,000 of it by C. G. Perrin; and $50,000 of it by Thomas E. Gaines; these three men constituting the board of directors. Of the preferred stock, $75,000 in face value was held by the Metropolitan National Bank of Kansas City, hereinafter called "Metropolitan Bank"; $50,000 by the National Bank of Commerce of Providence, R. I., hereinafter called "Providence Bank"; and $25,000 by J. Levy & Bros. of Cincinnati, Ohio, hereinafter called "Levy & Bros." At this time the mercantile company was, and for some time prior thereto had been, indebted to the Metropolitan Bank in the sum of $25,000; to the Providence Bank, $5,843; and Levy & Bros., $10,506,—the payment of none of which was secured. It was also indebted to the American Exchange National Bank of New York City, the plaintiff in error, in the sum of $6,250, likewise unsecured. This constituted all of the unsecured indebtedness on March 29, 1895. Whether the Metropolitan Bank, Providence Bank, and Levy & Bros. were the absolute owners of the preferred stock, or held it as collateral security for the payment of indebtedness due them, is, for the purposes of this case, unimportant. Besides this unsecured indebtedness, the mercantile company then owed to divers persons the sum of $123,521, the payment of all of which was duly secured by collateral. The mercantile company had prior to March, 1895, transacted a large busi-

ness in buying and selling liquor, but, for reasons unnecessary to mention, its business had declined, and was no longer profitable. Representatives of the Metropolitan Bank, Providence Bank, and Levy & Bros. met together in March, 1895, and, after consideration of their interests, decided that a change in management of the mercantile company was desirable. Conferences then followed between them and the officers and directors of the mercantile company, which resulted in the transfer of substantially all of the common stock from their former owners to them, and in the substitution of W. C. Glass and J. H. Wiles as directors in place of E. R. Martin and Thomas E. Gaines, the former of whom having before that time taken the place on the board formerly held by C. G. Perrin. Glass and Wiles were both directors of the Metropolitan Bank. E. L. Martin was continued as, president of the mercantile company. Glass was made vice president, and, because of a prior valuable experience in the liquor business, was made general·manager,·with full control over the business of the company, and immediately entered upon the discharge of his duties as such. The plaintiff in error was forthwith informed by E. L. Martin, the president, of this change in the management; Mr. Martin writing it that "the Metropolitan Bank [whose directors had become the managers of the mercantile company] thought the changes which are made would be beneficial to the common stockholders and creditors." Mr. Martin testifies, in substance, that the plaintiff in error was practically the only other unsecured creditor, besides the two banks already referred to and Levy & Bros., and he thought it should be notified of what was being done. The record shows that Martin was particularly friendly to plaintiff in error, and gave it full information of the transaction already detailed, which occurred on March 29, 1895, and that no objection or complaint was made by plaintiff in error with respect to that transaction. The new management in July, 1895, before appropriating any of the funds of the mercantile company to the payment of the unsecured indebtedness due to the Metropolitan Bank, Providence Bank, or Levy & Bros., remitted to plaintiff in error the sum of $1,250, thereby reducing its claim to $5,000. On December 18, 1895, it was found that additional money was required to properly carry on the business. At that time, with full knowledge and acquiescence by Mr. Martin, the president of the mercantile company, the following agreement was entered into:

"The Metropolitan Bank of Kansas City, Mo., the National Bank of Commerce of Providence, R. I., Jas. Levy & Bros., of Cincinnati, O., and the Martin-Perrin Mercantile Co., of Kansas City, Mo., in consideration of the mutual agreements herein contained, do hereby jointly and severally agree with each other as follows: The sum of fifteen thousand ($15,000) dollars is to be forthwith loaned by the three first parties named to the Martin-Perrin Mercantile Co. on its several promissory notes, all to be of even date, and at four months, less discount at six per cent. per annum, in the following amounts: Metropolitan National Bank, $7,500; National Bank of Commerce, $5,000; Jas. Levy & Bros., $2,500. This agreement is entered into on the express condition and understanding that all of said loans are to stand upon a parity and equality, and are made at the request of the said Martin-Perrin Mercantile Co., and are to be paid prior and preferable to the present unsecured indebtedness of said company, as the same now exists and appears on its books, to the other parties hereto, none of which shall in any manner be secured, paid, or discharged until the entire $15,000 herein agreed to be loaned is fully and entirely secured or paid; but the words 'present unsecured indebtedness' shall not be deemed to mean or include discounted customers' paper, or other paper that may be otherwise secured, but, as long as any part of such $15,000 is unpaid, such present unsecured indebtedness of such company to the other parties herein shall, as between said parties, be treated as a ·parity, so that, if for any reason security is taken by one, like security shall be taken for all, without preference as between each other. And the said Martin-Perrin Mercantile Co., by its signature hereto, agrees to pay said $15,000 in the manner herein expressly set out, and agrees not to pay, secure, or discharge its said unsecured indebtedness to the other parties hereto as the same now exists or appears on the said books of said company, other than as herein agreed.

And the Martin-Perrin Mercantile Company agrees that William C. Glass shall continue as vice president and manager of said company, but the other parties hereto in no wise assume any supervision, direction, or control of the said business.

"Witness the hands, respectively, of the parties hereto on the 18th day of December, A. D. 1895."

Pursuant to the terms of this agreement, the full amount of $15,000 was loaned to the mercantile company. Soon thereafter, and before appropriating anything to the payment of the claims of the two banks or Levy & Bros., in June, 1896, the new management again remitted to plaintiff in error $1,000, reducing its debt to $4,000. By reason of long and continued depreciation in value of a large stock of whisky on hand when the new management took charge, and also by reason of other unfortunate circumstances and conditions, the expectations of all concerned were disappointed, and on November 26, 1897, it was found advisable to wind up the business of the mercantile company. On that day, pursuant to a resolution of the board of directors, a chattel mortgage and deed of trust were executed, conveying all the property of the mercantile company to Hugh C. Ward and James K. Burnham, as trustees, to secure the payment of the following indebtedness: First. A note due the Metropolitan Bank for $7,500, a note due the Providence Bank for $5,000, and a note due Levy & Bros. for $2,500. These notes represented the loan as made by the payees, respectively, according to the agreement of December 18, 1895, no part of which had ever been paid. Second. Note due the Metropolitan Bank for $30,500, notes due the Providence Bank for $6,000, and notes due Levy & Bros. for $2,121.73. These represented the unsecured indebtedness of the payees, respectively, as it stood on November 26, 1897, and amounted to $6,722 in excess of the indebtedness of the mercantile company to them at the time they, in March, 1895, undertook, through their representatives, the management of the business. In other words, these three creditors in their effort to extricate themselves and the plaintiff in error, who, as already stated, were the only unsecured creditors in March, 1895, succeeded in paying off $2,250 of the debt due to the plaintiff in error, leaving a balance at that time due to it of $4,000, but increasing their own aggregate unsecured indebtedness in the sum of $21,722; the same consisting of loan of $15,000 made on December 18, 1895, and $6,722 in addition thereto. The plaintiff in error being informed by its friend, Mr. Martin, of all the steps taken by the new management from the beginning to the end, found no fault until the chattel mortgage and deed of trust were executed on November 26, 1897. This, Mr. Martin says, it complained of, saying, "It ought to have been secured, along with the balance of them, by mortgage." Plaintiff in error afterwards, and on December 20, 1897, instituted a suit by attachment in the circuit court of the United States for the Western district of Missouri against the mercantile company to recover the balance of $4,000 and interest then remaining due it, and caused Hugh C. Ward and Thomas K. Burnham, the defendants in error, to be summoned as garnishees. Interrogatories having been duly filed, the garnishees made answer in effect denying that they had in their possession any money or property belonging to the mercantile company; admitting the execution and delivery to them of the chattel mortgage and deed of trust of date November 26, 1897; reciting the trust created by the instruments, already referred to; and stating that in the execution of the trust thereby created they sold the major portion of the property conveyed to them, and then had in their possession, of the proceeds of such sale, $8,572.92, besides some notes and accounts, and that they held the same to be paid over to the Metropolitan Bank, Providence Bank, and Levy & Bros., the beneficiaries in the chattel mortgage and deed of trust. Plaintiff in error, after having secured judgment against the mercantile company in the attachment suit for the sum of $4,197.32, pursuant to the practice under the statutes of Missouri, filed its denial of the garnishees' answer, setting forth, in substance, that the chattel mortgage and deed of trust were not executed by the mercantile company: that W. C. Glass, who purported to execute the same as the vice president of the company, had no right or authority by virtue of any action of the board of directors of the company to execute the same,—and after detailing the facts hereinbefore stated, and

111 F.—50

freely characterizing each of them as fraudulent in their purpose and effect, alleged that the chattel mortgage and deed of trust under which the garnishees claimed to hold the property of the mercantile company were executed by it with intent to hinder, delay, and defraud the creditors of the mercantile company, and were therefore null and void. The case came on for a hearing on the issue so made, and at the conclusion of the evidence offered by plaintiff in error, who was the plaintiff below, the court, on motion of the garnishees, which, although somewhat doubtful in its character, we will for the purposes of this case treat as a demurrer to the evidence, sustained the same, and rendered a judgment in favor of the garnishees. To reverse this judgment a writ of error was duly prosecuted to this court.

Henry C. Solomon (Benjamin F. Wollman and Armwell L. Cooper, on the brief), for plaintiff in error.

Hugh C. Ward (Herbert S. Hadley and Frank Hagerman, on the brief), for defendants in error.

Before SANBORN and THAYER, Circuit Judges, and ADAMS, District Judge.

ADAMS, District Judge, after stating the case as above, delivered the opinion of the court.

The chief question for our determination is whether there was any substantial evidence to support the issue raised by plaintiff in error in the garnishment case. The denial setting forth the facts relied upon to avoid the chattel mortgage and deed of trust, and the brief and argument of counsel for plaintiff in error in treating of the facts of the case, abound in general statements of fraud and fraudulent intent; but a careful and considerate examination of all the evidence discloses substantially the facts recited in the foregoing statement, and those only. It cannot be true that there was any actual fraudulent intent or purpose on the part of the Metropolitan and Providence Banks or Levy & Bros. in the transaction complained of. It is strenuously argued that, securing the control and management of the mercantile company by their representatives, the banks and Levy & Bros. put themselves in position to secure a preference by the execution of the chattel mortgage and deed of trust in question. This result may have followed, but all the testimony and proof in the case satisfy us that no such purpose was originally contemplated by them. Nor was any such purpose contemplated by them at the time they loaned the $15,000, on December 18, 1895. They did not engage in the liquor business as a permanent venture, but, representing all the unsecured creditors except plaintiff in error, and discovering that the condition of the business of the mercantile company was such as required a new management in order to insure the payment of the unsecured debts, they, being at that time owners of all the preferred stock of the mercantile company, secured, by the voluntary action of the owners of the common stock, a controlling interest in the same, and with the full co-operation of the president of the company, and with the full knowledge and acquiescence of plaintiff in error, proceeded to elect directors satisfactory to themselves, and to take charge of the business. They conducted it for a period of about 2½ years, loaned money to the company without security, and, so far as the record discloses, transacted the business openly and fairly, and with

the single end in view of securing the payment of their own debts, and that of the plaintiff in error as well. Without reducing their aggregate demands at all, but increasing them in the sum of $21,722, they actually paid plaintiff in error one-third of its demand. At last, by reason of an unprecedented and unexpected decline in the value of a large stock of whisky on hand, they were forced to abandon their original undertaking. The record discloses no new creditors whose demands were created during the period of their management. Presumptively, none existed at the time they closed the business. In this condition of things the mortgage and deed of trust complained of by plaintiff in error were executed. For the purposes of this case it may be conceded that the directors and vice president of the mercantile company, who authorized and executed the mortgage and deed of trust, were so the representatives of the Metropolitan and Providence Banks and Levy & Bros., the beneficiaries in the mortgage and deed of trust, as to make their acts the acts of the beneficiaries themselves; in other words, that the legal effect of the condition of things as it existed, and of the acts done, was that the beneficiaries in the mortgage and deed of trust were in full charge of the mercantile company, and that they caused the deeds to be executed to secure their own demands against the mercantile company. Are the deeds so executed voidable at the instance of the plaintiff in error? This is the question now to be answered. Notwithstanding a contrariety of opinion on the subject, it is now, we think, established by persuasive and controlling authority that the insolvency of a corporation does not ipso facto transform its assets into a trust fund for the equal benefit of its creditors. This conclusion is reached in a number of decisions by the supreme court of Missouri, in which state the transactions involved in this suit occurred. Alberger v. Bank, 123 Mo. 313, 27 S. W. 657; Slavens v. Drug Co., 128 Mo. 341, 30 S. W. 1025; Schufeldt v. Smith, 131 Mo. 280, 31 S. W. 1039, 29 L. R. A. 830, 52 Am. St. Rep. 628. The same conclusion is reached by the supreme court of Minnesota in the case of Hospes v. Car Co., 48 Minn. 174, 50 N. W. 1117, 15 L. R. A. 470, 31 Am. St. Rep. 637, and by the supreme court of the United States in Fogg v. Blair, 133 U. S. 534, 541, 10 Sup. Ct. 338, 33 L. Ed. 721, and in Hollins v. Iron Co., 150 U. S. 371, 14 Sup. Ct. 127, 37 L. Ed. 1113. In the latter case the court, after reviewing the authorities bearing directly and indirectly on the status of the property of corporations after they become insolvent, concludes that the only trust attached to such property is in the administration of the assets after possession is taken by a court of equity, and is not a trust attached to the property, as such, for the direct benefit of either creditor or stockholder. Such being the law, it follows that an insolvent corporation may, in the exercise of its jus disponendi, prefer one creditor to another. The remaining question is whether it may prefer its own directors, if they happen to be creditors.

The relation of directors to their corporation is undoubtedly that of agents to principal. As such, they are charged with the duty of serving their principal faithfully, and with an eye single to its best interests. Their own personal welfare must at all times be sub-

servient to that of their principal. But this obligation ought not to be an insuperable barrier to the performance of their duty. Many cases may arise, and the one now under consideration fairly illustrates them, in which, by reason of the financial condition of their principal, it becomes impossible to borrow money from outsiders, and when a timely loan or forbearance in the enforcement of demands may bridge it over and start it on a successful career. The directors, of all others, best know the conditions and circumstances, and may be the only ones from whom succor can come. To say that they are so bound by a strict rule prohibiting contracting with themselves as to foreclose the possibility of securing aid is, in our opinion, carrying the rule beyond its reason. If they may contract with themselves, obviously they may thereby entitle themselves to all the incidents to such contract, and among them is the right to resort to all legal methods of securing the payment of their demands. This last-mentioned right, as said in Duncomb v. Railroad Co., 84 N. Y. 190, is equally true whether the pledge be taken for a present or precedent debt. The temptations to self-aggrandizement and dishonesty are, of course, great, and require the utmost good faith on the part of directors, and subject them and all their acts to the most rigid scrutiny. Their relations to the corporations are of that intimate and fiduciary character that they are very properly held, whenever their acts are questioned, to assume the burden of proving their absolute good faith and the perfect justice of their demands. The following authorities sustain the principles just announced: Foster v. Planing Mill Co., 92 Mo. 79, 4 S. W. 260; Schufeldt v. Smith, supra; Butler v. Mining Co., 139 Mo. 467, 41 S. W. 234, 61 Am. St. Rep. 464; Garrett v. Plow Co., 70 Iowa, 697, 29 N. W. 395, 59 Am. Rep. 461; Duncomb v. Railroad Co., supra; Harts v. Brown, 77 Ill. 226; Stratton v. Allen, 16 N. J. Eq. 229; Bank of Montreal v. F. E. Potts Salt & Lumber Co., 90 Mich. 345, 51 N. W. 512.

In Brown v. Furniture Co., 7 C. C. A. 225, 231, 58 Fed. 286, 292, 22 L. R. A. 817, 823, Judge Taft, speaking for the court of appeals for the Sixth circuit on this general subject, after reviewing the cases, says:

"Several cases have been cited, some of them decisions of circuit courts of the United States, in which it has been held that, while it is lawful for a corporation to prefer creditors, it is not equitable or permissible for directors of a corporation to prefer themselves, even if they are bona fide creditors, because they are trustees. It may be conceded that the trust relation justifies and requires courts of equity to subject preferences by an insolvent corporation of its own directors to the closest scrutiny, and places the burden upon the preferred director of showing beyond question that he had a bona fide debt against the corporation; but we do not see why, if a corporation may prefer one creditor over others, it may not prefer a director who is a bona fide creditor. Preferences are not based on any equitable principle. They go by favor, and as an individual may prefer, among his creditors, his friends and relatives, so a corporation may prefer its friends."

In the case of Gould v. Railway Co. (C. C.) 52 Fed. 680, Judge Caldwell had occasion to review the authorities on this subject, and concludes as follows:

"The corporation is under the same obligation to pay a bona fide debt due to one of its directors and stockholders that it is to pay a debt due to

a stranger, and a security given for a debt due to a stockholder is as valid as a security given to any other creditor. The doctrine established by the best considered cases and by the decisions of the supreme court of the United States is that the mere fact that the creditors of a corporation are directors and stockholders does not prevent their taking security to themselves as individuals to secure a bona fide loan of money previously made to such corporation, and used by it in conducting its legitimate corporate business."

The supreme court of the United States, in Richardson's Ex'r v. Green, 133 U. S. 30, 10 Sup. Ct. 280, 33 L. Ed. 516, in treating of the subject in hand, says:

"Undoubtedly his [Richardson's] relation as a director and officer or as a stockholder of the company does not preclude him from entering into contracts with it, making loans to it, and taking its bonds as collateral security; but courts of equity regard such personal transactions of a party in either of these positions, not, perhaps, with distrust, but with a large measure of watchful care, and unless satisfied by the proof that the transaction was entered into in good faith, with a view to the benefit of the company as well as of its creditors, and not solely with a view to his own benefit, they refuse to lend their aid to its enforcement."

See, also, Twin Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328.

The facts of the case now under consideration bring the banks' and Levy & Bros.' demands fully within the most stringent rule announced in the foregoing authorities. Their demands, for which they took security upon the property of the mercantile company, were not only just and legal, but, in our opinion, highly meritorious. They had not only forborne to assert them for a long period of time, but had advanced a large amount of money in the earnest and honest effort to extricate the mercantile company from its difficulties. They had not injured the plaintiff in error, but had materially improved its condition. No others are complaining, and, in our opinion, the plaintiff in error has no ground for so doing.

Counsel for plaintiff in error insist most strenuously that the evidence discloses a secret manipulation of the property of the mercantile company by the banks and Levy & Bros., with the intent and purpose of fraudulently converting it to their own use, while they, under the guise of conducting the business in the name of the mercantile company, lulled the plaintiff in error and other unsuspecting creditors into a sense of security. They assume and assert that in the creation and execution of the scheme inaugurated on March 29, 1895, the deliberate intention was: First, that the scheme should be kept secret; second, that all persons dealing with the mercantile company should continue to believe that the corporation was standing on its own feet, with no change in its corporate management or control; third, that fraudulent credit should thereby be secured. On these assumptions they construct an argument, but the assumptions are not supported by proof. As already disclosed, there is no substantial evidence of secrecy in devising or executing the scheme, or of any attempt to cause any one to believe that there was no change in the management of the company, and certainly no evidence of any attempt to secure fraudulent credit. The fact is conspicuous in this case that in March, 1895, there were no other unsecured creditors

besides the banks, Levy & Bros., and plaintiff in error, and there is no evidence whatsoever that any other credit was after that desired or secured; and there is affirmative, uncontradicted testimony that the plaintiff in error itself was in no manner injured by any of the acts of the banks and Levy & Bros., or their representatives,—on the contrary, that plaintiff in error was substantially benefited thereby. For want of necessary evidence, therefore, the case largely relied upon by counsel for plaintiff in error (American Oak Leather Co. v. United States Rubber Co., 37 C. C. A. 599, 96 Fed. 891, decided by the court of appeals for the Seventh circuit) has no application. Not only is this true, but plaintiff in error has been deprived of this supposed bulwark by the recent reversal of the case by the supreme court of the United States. See United States Rubber Co. v. American Oak Leather Co., 181 U. S. 434, 21 Sup. Ct. 670, 45 L. Ed. 938. It results, therefore, that there was neither actual nor constructive fraud in the transactions complained of.

It was suggested by counsel in their argument that the chattel mortgage and deed of trust were inoperative and void because executed on behalf of the mercantile company by W. C. Glass, the vice president, instead of by the president. All that need be said concerning this is that there is no assignment of error predicated upon any such defective execution of the instruments in question, and, even if there were, it would have no merit, because, under the provisions of section 982 of the Revised Statutes of Missouri of 1899, it is made lawful for any corporation to convey lands by deed sealed with the common seal of the corporation, and signed by the president, vice president, or presiding member or trustee of the corporation. That section fully warranted the execution of the deed of trust in question. Section 954 of the same statutes empowers the directors to elect a president and appoint a treasurer and secretary, and such other officers and agents as shall be prescribed by the by-laws of the company. The by-laws, which are adopted by the stockholders, determine the agents so to be appointed and their powers. The record shows that the vice president was authorized by the board of directors to execute the instruments, including the chattel mortgage in question. Plaintiff in error failed to disclose what powers were vested in the vice president, and certainly failed to show that he was not empowered to execute the instruments. The burden was on it to make this showing, if the facts warranted it. Having failed to do so, it will be presumed that the agent who might have exercised the power in question was duly authorized to do so, and that he properly and lawfully executed the chattel mortgage.

There are several assignments of error relating to the court's action in rejecting testimony. On a careful consideration of them, we find that some of them are not predicated on any proper exceptions taken at the time of the ruling. The others relate to the exclusion of some details of evidence, which, if material, were fully covered by other evidence found in the record.

We are of opinion that there was no substantial evidence to support the issue raised by plaintiff in error in the garnishment case, and no wrong done to plaintiff in error in the course of the trial. The judgment must therefore be affirmed.