In re CREECH BROS. LUMBER CO.*

TITLOW v. MacPHAIL.

(Circuit Court of Appeals, Ninth Circuit. February 26, 1917.)

No. 2827.

1. BANKRUPTCY ☞440—REVIEW—PROCEEDINGS.
    Where the proper method to obtain review of an order in bankruptcy is doubtful, a party may appeal in accordance with Bankruptcy Act July 1, 1898, c. 541, § 24a, 30 Stat. 553 (Comp. St. 1913, § 9608), and also petition to review in accordance with section 24b.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 915.]

2. BANKRUPTCY ☞440—REVIEW—ALTERNATIVE METHODS.
    Where, in a proceeding to review an order in bankruptcy, an appeal is taken as well as a petition to review in matter of law, the appellate tribunal must determine which is the correct procedure, since each is exclusive of the other.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 915.]

3. BANKRUPTCY ☞440—REVIEW—PROCEDURE—APPEALS.
    An order allowing as preferred a claim of several thousand dollars, may be reviewed by an appeal under either Bankruptcy Act, § 24a, or sec-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied May 14, 1917.

tion 25a, cl. 3 (Comp. St. 1913, §§ 9608, 9609), *respectively providing for appeals in controversies arising in bankruptcy and for appeals as in equity from judgments allowing or rejecting a debt or claim of $500 or over.*

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 915.]

4. CORPORATIONS ⬉⇒550(2)—INDEBTEDNESS—ASSIGNMENTS.

Pursuant to an agreement entered into between a lumber company which later became bankrupt and all of its ascertained creditors, the company's plant was assigned to claimant for operation. Claimant agreed to operate the plant as assignee, to purchase logs for that purpose, and otherwise finance operation, provided it could be run at a profit, applying all proceeds for the benefit of creditors after repaying his own advances. The agreement further provided that in case the plant could not be run at a profit of $1,000 per month, claimant might cease operations and sell and dispose of the property, and, after reimbursing himself for sums advanced, pay the creditors. *Held,* that the agreement having been ratified by the creditors, it was not invalid, it not appearing that the company was then insolvent, as depriving creditors of the property of the debtor company, which later became bankrupt, in violation of the trust fund theory.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2191, 2192, 2194.]

5. BANKRUPTCY ⬉⇒178(3)—VALIDITY—EFFECT OF.

As a general assignment of all the person's property is not per se fraudulent, such assignment cannot be attacked as tending to hinder and delay creditors, it being for the benefit of creditors, even if bankruptcy occurred within four months after the assignment.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 221, 283, 284.]

6. BANKRUPTCY ⬉⇒178(3)—ASSIGNMENTS—VALIDITY.

An assignment by a corporation of its property to a trustee for operation, made more than four months before bankruptcy, cannot be questioned in the bankruptcy proceedings.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 221, 283, 284.]

7. BANKRUPTCY ⬉⇒467—CLAIMS—RIGHT OF CLAIMANT.

That the trustee is by Bankruptcy Act, § 47, subd. a, cl. 2, as amended by Act June 25, 1910, c. 412, § 8, 36 Stat. 840 (Comp. St. 1913, § 9631), deemed vested with all the rights, remedies, and powers of any creditor holding a lien by legal or equitable proceedings, does not enlarge the right of a creditor appealing in the name of the trustee from an order allowing another claimant a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 929.]

8. ESTOPPEL ⬉⇒78(2)—EQUITABLE ESTOPPEL.

All the ascertained creditors of a lumber corporation which subsequently became bankrupt consented to the assignment of the company's property to a trustee for management. The holder of notes which were subsequently transferred to the bank of which appellant was receiver signed the agreement, and the insolvent bank had actual knowledge thereof before it received the notes. *Held,* that appellant and the other creditors were estopped from attacking the priority given the assignee in the contract of assignment.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 205.]

Appeal from and Petition for Revision of Proceedings of the District Court of the United States for the Southern Division of the Western District of Washington; Jeremiah Neterer, Judge.

In the matter of the bankruptcy of Creech Bros. Lumber Company, a corporation. The claim of H. W. MacPhail to a preference was allowed, and from such order A. R. Titlow, as receiver of the United States National Bank of Centralia, appearing in the name and stead of Robert G. Chambers, as trustee of the bankrupt company, appeals and

petitions to revise the order in matter of law. Petition for revision dismissed, and order affirmed on appeal.

Creech Bros. Lumber Company, a corporation operating a sawmill and engaged in the manufacture of lumber, being in an insolvent condition and for that reason unable to pay its debts, procure credit, or purchase logs necessary in the operation of its sawmill, entered into an agreement with H. W. MacPhail, respondent and appellee, on October 29, 1912, whereby all the property and assets of the lumber company were assigned to MacPhail, who was given an irrevocable power of attorney and was to continue operations for such time as the plant could be operated at a profit of $1,000 per month, sell the property and assets, and apply all proceeds for the benefit of all the creditors; it being provided, however, "that any sums advanced by the second party (MacPhail) or any sums which he may contract as indebtedness in the operation of said plant, or in the purchase of logs or the employment of labor for the operation of said plant shall be a first and prior lien and shall be paid prior to the payment of any sums now due the creditors of said corporation." It was further provided "that from the profits derived from the operation of said plant, he (MacPhail) shall first reimburse himself for any sums advanced by him and shall next pay and discharge any bills or indebtedness which he may contract in the operation of said plant, and the remainder, if any, he shall pay to the creditors pro rata, share and share alike, in proportion to their said claims;" and, further, that in case the plant should fail to clear the sum of $1,000, net, per month, MacPhail might, at his option, "cease to operate said plant, and sell and dispose of all of said real estate and personal property, and accounts and bills receivable for the purpose of first reimbursing himself for any sums advanced by him or any sums contracted by him in the operation of said plant, and second to pay the creditors of the first party in full or pro rata, and the fact that he may cease to operate said plant shall not be construed as terminating his rights under this contract until he has been fully paid for all sums by him advanced and until all sums by him contracted for have been fully paid, satisfied and discharged, and creditors have been paid in full or said assets have been all reduced to cash and the second party reimbursed, and the balance paid, pro rata, to the creditors of the first party."

Stockholders owning a majority of the stock of the Creech Bros. Lumber Company indorsed upon this instrument their consent to and approval of all its terms and conditions, and the action of the president and secretary in executing the same. The instrument was never acknowledged or recorded.

Prior to the execution of this instrument, on October 21, 1912, Creech Bros. Lumber Company secured from its creditors an agreement, consenting to the assignment mentioned in the foregoing contract of October 29, 1912, and reading, in part, as follows:

"Whereas, the stockholders and trustees of said corporation have agreed to make an assignment to H. W. MacPhail for the benefit of all of the creditors of said corporation, and whereas, the said H. W. MacPhail has agreed to operate said plant as assignee and purchase logs for that purpose and otherwise finance the operation of the same, provided the same can be operated at a profit, and also provided the creditors will extend the time of payment of their several accounts and desist from pressing said accounts until they can be paid by the profits derived from the operation of said plant: Now, therefore, we the undersigned creditors, in consideration of said assignment and of the agreement of the said H. W. MacPhail to finance said plant, severally agree that if said assignment is made and if the said H. W. MacPhail shall finance and operate said plant, that we will extend the time of payment of our several claims and desist from pressing said claims in the courts or otherwise, so long as said plant is operated at a monthly net profit of $1,000 or more per month. It being understood that in the operation of said plant that the said H. W. MacPhail shall first pay the cost of operation and all sums contracted by him as such assignee, and all sums advanced by him, and thereafter shall pay to the creditors interest at the rate of eight per cent. per annum on their said accounts, and shall pay the balance to the said creditors pro rata, share and share alike in proportion to their several claims, payments to be made quarterly, commencing on the 1st day of March, 1913, and continuing until all of said indebtedness, including principal and interest is paid in full."

"This consent was executed by most of the creditors, though not all; the books of the lumber company at that time being in such condition that it was impossible to definitely ascertain to whom or in what amounts the company was indebted.

MacPhail took possession of the plant as trustee under the assignment of October 29th about November 1, 1912, and operated the same until July or August, 1913, when it was found the plant could no longer be operated at a profit, due to a "break" in the market. MacPhail immediately notified all creditors and stockholders of the bankrupt by letter, and requested to be relieved of the so-called assignment or agreement, but was not relieved, and retained possession of all of the assets until about July 28, 1914, when a receiver was appointed by the superior court of the state of Washington in a suit against the lumber company by John L. Myers. During the operation of the mill MacPhail paid something over 10 per cent. of the claims of the creditors; paid over $3,000 in insurance; over $2,000 in taxes; and upon the mill being closed down, after having paid for all of the logs amounting to over $93,000 and for labor amounting to over 46,000, together with other items necessarily disbursed, he found that he had expended $13,877.71 of his own funds in excess of the various payments which had been made him from the earnings.

On August 27, 1914, proceedings in involuntary bankruptcy were instituted by certain creditors of the lumber company, and on November 16, 1914, an adjudication of bankruptcy was made, and Robert G. Chambers duly appointed trustee in bankruptcy on December 28, 1914. MacPhail presented his claim, which, with interest thereon, amounted to $15,170.69, to the referee, who, on October 6, 1915, disallowed the same as a preferred claim. Thereupon MacPhail petitioned for an order certifying the record to the United States District Court for the Western District of Washington, Southern Division, for review; and an order was entered by that court on March 25, 1916, allowing the claim as preferred in the sum of $13,877.74.

The plant and other property and assets of the bankrupt estate were sold by the trustee in bankruptcy, and the amount realized therefrom was somewhat less than the amount of appellee's claim. The appellee received no compensation for his services in operating the property.

The United States National Bank of Centralia became insolvent on September 21, 1914, and A. R. Titlow was thereafter duly appointed receiver thereof. At the time of the execution of the agreement of October 29, 1912, the United States National Bank was not a creditor of the bankrupt company, but subsequently became such, and the receiver has proved its claim in the sum of $16,255.75. Charles H. Gilchrist, the vice president and manager, and George Dysart, one of the other officers of this bank, were instrumental in procuring the signature of the bankrupt corporation and of the creditors to the agreements of October 21, 1912. The former was at that time the president of the Willapa Harbor State Bank, and at the time the United States National Bank procured the notes on which its claim is founded and which make it a creditor, it knew, through the dual capacity of its vice president and manager, that MacPhail was in possession of the mill and all of the property of the bankrupt, and of the agreement signed by the creditors, and had full notice and knowledge of all of the facts relating thereto.

A. R. Titlow, as receiver of the United States National Bank of Centralia, appearing in the name and stead of Robert G. Chambers, as trustee in bankruptcy of the estate of Creech Bros. Lumber Company, petitions this court for a review of, and appeals from, the order allowing the preferred claim of MacPhail in the sum of $13,877.74.

R. P. Oldham and R. C. Goodale, both of Seattle, Wash. (Walter L. Nossaman, of Seattle, Wash., of counsel), for appellant and petitioner.

John T. Welsh and Martin C. Welsh, both of South Bend, Wash., for appellee and respondent.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). [1] 1. The case comes here upon appeal from an order of the bankruptcy court under section 24a of the Bankruptcy Act, and also upon a petition to review such order under section 24b of the same act, because of a doubt as to the correct procedure for obtaining a review of the order in controversy. Both methods of procedure may be resorted to in order to avoid a mistake in the remedy. Chavelle v. Washington Trust Co., 226 Fed. 400, 405, 141 C. C. A. 230.

[2] But when the case is here upon both methods of procedure, this court must determine which of the two the court is authorized to entertain, since each is exclusive of the other (Bothwell v. Fitzgerald, 219 Fed. 408, 413, 135 C. C. A. 212; Pindel v. Holgate, 221 Fed. 342, 346, 137 C. C. A. 158, Ann. Cas. 1916C, 983), and the scope of the review is not the same.

[3] The matter in controversy is a claim which the bankruptcy court allowed as a preferred claim. The objection to the claim is that it is not a preferred claim under the statute. The controversy comes, therefore, under clause 3, § 25a, of the bankruptcy act, which provides for an appeal "as in equity" from "a judgment allowing or rejecting a debt or claim of five hundred dollars or over," and is appealable under that section, and also under section 24a as a controversy "arising in bankruptcy proceedings."

[4] 2. It is contended by the appellant that the instrument under which MacPhail took possession and operated the plant of the Creech Bros. Lumber Company was illegal: First, because it violated the trust fund theory of the law of the state of Washington as applied to the assets of an insolvent corporation; and, second, it was a fraudulent conveyance because it hindered and delayed creditors.

It is contended that these objections are supported by the decision of the Supreme Court of Washington in Thompson v. Huron Lumber Co., 4 Wash. 600, 30 Pac. 741, 31 Pac. 25, where the court said:

"When it [the corporation] has reached a point where its debts are equal to or greater than its property, and it cannot pay in the ordinary course, and its business is no longer profitable, it ought to be wound up and its assets distributed. Therefore no device can receive the countenance of the courts which provides for an indefinite continuance of its corporate life under the protection of a mortgage, against the protest of those who are entitled to share in its property, be it much or little. The hindrance and delay contemplated by the terms of the instrument ought to render it null and void."

This was said with respect to property which remained in the possession of the mortgagor after the execution of the mortgage, and the mortgagor continued in business in every respect in the same manner as it had done prior to the execution of the mortgage. But, referring to the stipulations contained in the mortgage, the court said that the irresistible conclusion was "that the mortgage was designed to act as a shield between the corporation and its other creditors while it prosecuted its ordinary business for an indefinite length of time." In other words, it was a preference in favor of the mortgagee for an existing debt, running counter to the purpose of the law to distribute the assets of an insolvent corporation ratably among its creditors. Upon this

feature of the case, the court, upon page 605 of 4 Wash., on page 742 of 30 Pac., said:

"A general assignment without preferences does not defeat this purpose, but, if the estate of a corporation comes into the court or into the hands of the assignee burdened with preferences, there is an end of equal distribution, and the object of the law is defeated."

There is not a particle of evidence tending to show that the assignment in this case was designed to act as a shield between the corporation and its creditors, or to burden the transaction with preferences other than such as were necessary to continue the business of the corporation as a going concern until the debts were paid or the assets reduced to cash and distributed among the creditors. Upon the other hand, it does appear that the assignment was designed to benefit all the creditors, and there was never any protest upon the part of any of the creditors against the assignment, nor was there any objection to the operation of the plant by MacPhail under its terms. The assignment was without any preferences whatever as to any of the creditors of the lumber company at the date of the instrument. The assignment was made on October 29, 1912, in pursuance of an agreement signed by the creditors of the lumber company on October 21, 1912, wherein it was recited that the stockholders and trustees of the lumber company had agreed to make an assignment to MacPhail for the benefit of all the creditors of the corporation, and that MacPhail had agreed to operate the plant as assignee and purchase logs for that purpose and otherwise finance the operation of the plant, provided the same could be operated at a profit, and provided also the creditors would extend the time of payment of their several accounts and desist from pressing said accounts until they could be paid from the profits derived from the operation of the plant. In accordance with this agreement, the lumber company, eight days later, made the assignment in controversy, wherein it was recited that MacPhail had signified his willingness to finance the operation of the plant, provided he could be amply and fully protected for all sums advanced or contracted by him, and provided the creditors would extend the time of payment of their several claims and desist from pressing said claims in the courts or otherwise; and it was accordingly so provided in the agreement. That is to say, it was provided that any sums advanced by MacPhail and any sums he might contract as an indebtedness in the operation of the plant, or in the purchase of logs or the employment of labor for the operation of the plant, should be a first and prior lien, and should be paid prior to the payment of any sums then due the creditors of the lumber company. It was further provided that the fact that MacPhail might cease to operate the plant should not be construed as terminating his rights under the contract until he had been fully paid for all sums by him advanced, and until all sums by him contracted for had been fully paid, satisfied, and discharged, and the creditors had been paid in full, or the assets had all been reduced to cash and MacPhail reimbursed and the balance paid pro rata to the creditors of the lumber company.

This assignment followed strictly the terms of the prior agreement signed by all the creditors that could then be ascertained. The United States National Bank of Centralia was not then a creditor of the lumber company and, of course, did not sign the agreement; nor did Titlow, its receiver, who now prosecutes this appeal in the name of the trustee.in bankruptcy; nor was the bank or its receiver in any way interested in the affairs of the lumber company at that time. But the Willapa Harbor State Bank was a creditor, and it signed the agreement, authorizing the lumber company to execute the contract making the assignment to MacPhail, and thereafter the Willapa Harbor State Bank, holding the notes of the lumber company, sold and assigned the notes to the United States National Bank of Centralia. It was in this manner that the latter bank has become a creditor of the lumber company. The notes were sold to the United States National Bank subsequent to the execution of the assignment and while MacPhail was operating the lumber company plant under the assignment. It appears, further, that at the time the United States National Bank purchased these notes from the Willapa Harbor State Bank, and thus became a creditor of the lumber company, it took with actual notice of all the facts concerning the agreement with the creditors and the assignment of the property of the lumber company to MacPhail with all the priorities in his favor therein provided for. This notice has been established by evidence that C. H. Gilchrist was the president of the Willapa Harbor State Bank and was the vice president and manager of the United States National Bank, and the testimony shows that Gilchrist was instrumental in obtaining the signature of some of the creditors to the agreement providing for the assignment by the lumber company to MacPhail, and the court has so found as a fact.

This makes a very different case from that stated in Thompson v. Huron Lumber Co., supra. A case more in point is that of Vincent v. Snoqualmie Mill Co., 7 Wash. 566, 571, 35 Pac. 396. In that case the mill company had given a mortgage to the Parke & Lacy Machinery Company to secure the purchase price of certain real estate and machinery. Upon the execution of the mortgage, the mortgagee at once entered into possession of the property covered by it, but did not operate the mill, which remained idle for several months. In proceedings brought by one Vincent to enforce a laborer's lien against the mill company, and in proceedings brought to foreclose the mortgage in favor of the Parke & Lacy Machinery Company, numerous defendants were brought into the case, claiming liens upon the property. A single judgment was entered, the property sold, and the proceeds ordered distributed, first, in payment of certain lien claims, and then to the Parke & Lacy Machinery Company in satisfaction of its mortgage. Appeals were prosecuted from this judgment on behalf of claims disallowed or denied priority. These appeals attacked the validity of the Parke & Lacy Machinery Company mortgage. It was contended that the mortgage was void as being intended to delay, hinder, and defraud creditors, and that the case fell within the decision of the court in Thompson v. Huron Lumber Co., supra; the appellants insisting that the mill company was insolvent at the time this

mortgage was executed. The court distinguished the case from the Thompson Case in the following language:

"It is not clearly apparent that the corporation was insolvent at said time. It had been operating its mill up to within a few days before the execution of the mortgage. It was then being pressed by its creditors, and was unable to pay them at that time, and it is doubtful whether the general market value of its property equaled the amount of its indebtedness, but its evident desire was to continue in business, and to get the matters of the corporation in better shape by getting the title to the property which it was operating in its own hands, and it fairly appears from the record that the mortgage was executed in good faith for this purpose, and that the company, at the time the mortgage was given, intended to continue business through the mortgagee in the way of operating its mill, to whom possession thereof was transferred."

The validity of the mortgage lien was sustained.

We think the assignment in the present case has a much stronger equity in its favor than the mortgage in the case last cited; but we need not dwell upon that question, since the obviously important question in this case is whether the assignment was legal.

[5, 6] 3. Upon that question, we are of opinion that it was legal. It contained no preferences in favor of any of the then creditors of the corporation, and it had no general fraudulent intent. It was permitted by the law of the state, and was the exercise of a right which every one claims over that which is his own. As said by Mr. Chief Justice Marshall in Brashear v. West, 7 Pet. (32 U. S.) 608, 614 (8 L. Ed. 801):

"That a general assignment of all a man's property is, per se, fraudulent has never been alleged in this country. The right to make it results from that absolute ownership which every man claims over that which is his own."

In the case of In re Gutwillig (C. C.) 90 Fed. 475, 476, Judge Brown said:

"Voluntary assignments for the benefit of creditors, * * * as practiced in this and other states, do not originate in the state statutes, but in the common-law power of the debtor to dispose of his property."

In Mayer v. Hellman, 91 U. S. 496, 500 (23 L. Ed. 377) Mr. Justice Field said:

"The validity of the claim of the assignee in bankruptcy depends, as a matter of course, upon the legality of the assignment made under the laws of Ohio. Independently of the Bankruptcy Act, there could be no serious question raised as to its legality. The power which every one possesses over his own property would justify any such disposition as did not interfere with the existing rights of others; and an equal distribution by a debtor of his property among his creditors, when unable to meet the demands of all in full, would be deemed not only a legal proceeding, but one entitled to commendation. * * * The hindrance and delay to particular creditors, in their efforts to reach before others the property of the debtor, that may follow such a conveyance, are regarded as unavoidable incidents to a just and lawful act, which in no respect impair the validity of the transaction. * * * The assignment in this case was not a proceeding * * * in hostility to the creditors, but for their benefit. It was not therefore void as against them, or even voidable. Executed six months before the petition in bankruptcy was filed, it is, to the assignee in bankruptcy, a closed proceeding."

In Randolph v. Scruggs, 190 U. S. 533, 23 Sup. Ct. 710, 47 L. Ed. 1165, a corporation had assigned all its corporate property for the

benefit of its creditors. Within four months after the date of the assignment, the corporation, upon the petition of its creditors, was adjudicated a bankrupt, and the deed of assignment was set aside as in contravention of the bankruptcy law (clause 4 of section 3, Act of July 1, 1898; 30 Stat. 544, 546). The appellants filed a claim against the bankrupt estate and the assignee for various services rendered, among others for professional services rendered the bankrupt corporation in preparing the deed of·general assignment, and· the assignee thereunder in advising and counseling him in respect of his duties as assignee. The items of the various services rendered were specified in the claim, and their relation to the bankrupt estate stated. The referee, upon the evidence, found and certified that the services had' been rendered as claimed, but that the same did not constitute expenses allowable as a preference, and were not otherwise a lien. The district judge sustained· the referee in so far as he held the claims to be nonpreferential, and adjudged that none of the items constituted a debt provable for any purpose against the bankrupt estate. From this judgment the appellants appealed to the United States Circuit Court of Appeals, and that court certified to the Supreme Court certain questions framed with reference to the character of the different services rendered by the appellants in the administration of the estate, among others the question whether the assignment providing that the costs and expenses of administering the trust should be first paid entitled such costs and expenses to be proven as a preferential claim against the bankrupt estate. Answering this question, the court said:

"The assignment was not illegal. It was permitted by the law of the state, and cannot be taken to have been prohibited by the bankruptcy law absolutely in every event, whether proceedings were instituted or not. In re Sievers (D. C.) 91 Fed. 366; In re Romanow (D. C.) 92 Fed. 510. It had no general fraudulent intent. It was voidable only in case bankruptcy proceedings should be begun. At the time when it was made the institution of such proceedings was uncertain. It seems to us that it would be a hard and subtle construction to say, as seems to have been thought in Bartlett v. Bramhall, 3 Gray (Mass.) 257, 260, that when they were instituted they not only avoided the assignment, but made it illegal by relation back to its date, when, if they had not been started, it would have remained perfectly good. No doubt the corporation had notice of the bankruptcy law, but it could not go into bankruptcy by voluntary petition, and there is no objection to a debtor's distributing his property equally among his creditors of his own motion, if bankruptcy proceedings do not intervene. The view we take is that which has been taken by state decisions with reference to similar questions raised by creditors or under state insolvent laws. Biglow v. Baldwin, 1 Gray (Mass.) 245, 247; White v. Hill, 148 Mass. 396 [19 N. E. 407]; Clark v. Sawyer, 151 Mass. 64 [23 N. E. 726]; Wakeman v. Grover, 4 Paige (N. Y.) 23, 43; s. c., 11 Wend. 187, 226 [25 Am. Dec. 624]. See, also, Mayer v. Hellman, 91 U. S. 496, 500, 501 [23 L. Ed. 377]."

The court said further:

"The assignee is acting lawfully in what he does before proceedings in bankruptcy are begun, and, although it may be assumed that the avoidance of the assignment relates back to the date of the deed, still so far as his services, or services procured by him, tend to the preservation or benefit of the estate the mere fiction of relation is not enough to forbid an allowance for them."

The court accordingly answered·the question referred to by allowing the claim as preferred in the right of the assignee.

It follows that an assignment made for the benefit of creditors by an individual or by a corporation, without fraudulent intent, is valid even where the assignment is set aside by bankruptcy proceedings commenced within the statutory period of four months from the date of the assignment; and where the assignment has been made more than four months before the commencement of bankruptcy proceedings, the assignment is a closed proceeding. It follows, also, that a preference provided for in the assignment and growing out of the administration of the assigned property by the assignee, made in good faith and without fraudulent intent, is valid; and, where an assignment with such a preference has been made more than four months before the commencement of bankruptcy proceedings, the question as to its validity is closed.

The law of the two latter cases is, in our opinion, applicable to the controlling question in this case, and determines that the assignment, with its preference in favor of the administration of the property by the assignee, was valid, and in no legal or equitable sense did it hinder or delay creditors.

[7, 8] 4. But we think that there is a further and a conclusive answer to all the objections urged against the assignment. It was made pursuant to the stipulation or agreement of all the creditors ascertainable at the time of the assignment. The Willapa Harbor State Bank signed that agreement. Its president, who was also the vice president and manager of the United States National Bank of Centralia, together with another officer of the latter, was instrumental in procuring the signature of the bankrupt corporation to the assignment and the signature of the creditors to the agreement. The promissory note which it then owned was afterward transferred to the United States National Bank of Centralia. It is upon this claim so transferred that Titlow, as receiver of the United States National Bank of Centralia, is now contesting the MacPhail claim in the name of the trustee in bankruptcy. No other creditor objects to this claim. It is true that the appeal from the order allowing this claim is brought here in the name of the trustee in bankruptcy of the estate of Creech Bros. Lumber Company, who, as such trustee under the Bankruptcy Act as amended by the act of June 25, 1910, 36 Stat. 838, 840, as to all property in the custody or coming into the custody of the bankruptcy court, is "deemed vested with all the rights, remedies, and powers of a creditor holding a lien by legal or equitable proceedings thereon." Section 47, clause 2, subd. "a," of the act. But this authority of the trustee in a bankruptcy court does not affect the validity or equity of any other lienholder.

The MacPhail claim stands upon its legal and equitable rights, and the United States National Bank, as the owner of the note issued by the Creech Bros. Lumber Company to the Willapa Harbor State Bank, is, by reason of the act of the president of the latter bank, now estopped to deny this claim. As said by Judge Taft in Simonson v. Sinsheimer, 95 Fed. 948, 954, 37 C. C. A. 337, 343:

It is a just ground for refusing to allow a man to complain of an act of bankruptcy that "he induced the act, or after its commission he so acted with

regard to it that he gave others the right to act on the faith of its validity so far as his subsequent conduct would affect it. * * * It would be equally unjust to allow him to repudiate as invalid, a transaction, when by his conduct he had induced others to change their position on the faith of its validity."

The position of the other creditors of the estate is no better. The assignee, immediately upon the execution of the assignment, went into possession of all the property under its terms; his possession covering a period of about 1 year and 9 months, during about 7½ months of which he had the plant in active operation for the benefit of the creditors. This possession was an actual notice to all the creditors of the estate, and placed them on inquiry as to the terms of such possession. During all this time no one objected to the administration of the estate by the assignee; but, on the contrary, the creditors acquiesced and accepted its benefits. They accepted from him over 10 per cent. of their claims, and interposed no objection to his payment of over $3,000 in insurance, over $2,000 in taxes, over $93,000 for logs, and over $46,000 for labor and other necessary disbursements, making in all an aggregate of $13,877.71 more than he had received during the administration of the estate. In this there is no claim for compensation for any services rendered by the assignee; it is for money actually expended by him in good faith for the benefit of the estate. Under the law of estoppel, the creditors cannot now object to the assignment or to the administration of the estate under its terms. Damon v. Leque, 14 Wash. 249, 252, 44 Pac. 261; Bank of California v. Puget Sound Loan, Trust & Banking Co., 20 Wash. 636, 643, 56 Pac. 395; McAvoy v. Jennings, 39 Wash. 109, 114, 81 Pac. 77; Davis v. Iowa Fuel Co., 144 Iowa, 138, 122 N. W. 815, 816, 24 L. R. A. (N. S.) 1166; Simonson v. Sinsheimer, 95 Fed. 948, 954, 37 C. C. A. 337; American Exchange National Bank v. Ward, 111 Fed. 782, 786, 49 C. C. A. 611, 55 L. R. A. 356; Memphis Savings Bank v. Houchens, 115 Fed. 96, 105, 52 C. C. A. 176; Ohio Motor Car Co. v. Eiseman Magneto Co., 230 Fed. 370, 375, 144 C. C. A. 512; Tiffany v. Boatman's Institution, 18 Wall. 375, 388, 21 L. Ed. 868; Dickerson v. Colgrove, 100 U. S. 578, 580, 25 L. Ed. 618; Jencks v. Quidnick Co., 135 U. S. 457, 465, 10 Sup. Ct. 655, 34 L. Ed. 200.

The order of the District Court is affirmed.

The petition for revision is dismissed.